UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| ELECTRIC MACHINERY | ) | |
| ENTERPRISES, INC., | ) | Case No. 03-11047-8W1 |
| | ) | |
| Debtor. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| | | |
| ELECTRIC MACHINERY | ) | |
| ENTERPRISES,  INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Adversary No. 03-00811 |
| | ) | |
| HUNT CONSTRUCTION GROUP, INC., | ) | |
| THE CLARK CONSTRUCTION GROUP, | ) | |
| INC.,  and CONSTRUCT TWO | ) | |
| CONSTRUCTION MANAGERS, | ) | |
| INC., individually and as joint venturers | ) | |
| trading as "HCC," and THE BOARD | ) | |
| OF COUNTY COMMISSIONERS OF | ) | |
| ORANGE COUNTY, FLORIDA, | ) | |
| | ) | |
| Defendants. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

<u>AMENDED COMPLAINT</u>

As a matter of right pursuant to F.R.Bankr.P. 7015 and F.R.Civ.P. 15(a),

the Plaintiff, Electric Machinery Enterprises, Inc. ("EME"), by its undersigned attorneys,

files this Amended Complaint against the Defendants, Hunt Construction Group, Inc.

("Hunt"), The Clark Construction Group, Inc. ("Clark"), and Construct Two Construction

Managers, Inc. ("Construct Two"), individually and as joint venturers trading as "HCC,"

and the Board of County Commissioners of Orange County, Florida ("County"), and

says:

Plaintiff and Jurisdiction

1.  This is an adversary proceeding for injunctive relief to prevent

destruction of records that constitute evidence or potential evidence in a dispute between

Plaintiff and Defendants as to a substantial asset that constitutes property of the estate and

upon which Plaintiff relies in confirming its Chapter 11 Plan of Reorganization, for

turnover of property of the estate, and for damages.

2.  EME is a Debtor in a Chapter 11 case filed on May 29, 2003, that is

pending in this district and division, Case No. 03-11047-8W1.  EME is acting as a debtor

in possession, operating its business, and pursuing confirmation of a Plan of

Reorganization.

3.  This Court has subject matter and in personam jurisdiction pursuant to

the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq., 28 U.S.C. § 1334, 28

U.S.C. § 157(a), and the standing order of reference entered by the district court.  This is

a core proceeding within the meaning of 28 U.S.C. § 157(b) and concerns the

administration of the estate, turnover of property, and determination of the validity,

extent, and priority of claims and liens.  It is also a core proceeding because EME is a

debtor in possession that came into existence only during the administration of its

bankruptcy estate and continued and concluded a construction contract using estate

assets, including assets subject to a court-approved cash collateral order, while receiving

2

the protection of the automatic stay, in its effort to achieve successful bankruptcy reorganization.  EME consents to the entry of final orders and judgment by the bankruptcy judge.

Defendants

4.  Hunt is a Florida corporation that is doing business in the Middle District of Florida and is a member of a joint venture that executed a contract with the EME as construction manager for County relating to electrical work for the construction of the Orange County Convention Center, Phase V Expansion  ("Center").  Hunt or its agents and others under its control or with contractual relationships possess substantial records relating to construction of the Center.

5.  Clark is a foreign corporation that is doing business in the Middle District of Florida and is a member of a joint venture that executed a contract with the EME as construction manager for County relating to electrical work for the construction of the Center.  Clark or its agents and others under its control or with contractual relationships possess substantial records relating to construction of the Center.

6.  Construct Two is a Florida corporation that is doing business in the Middle District of Florida and is a member of a joint venture that executed a contract with the Debtor as construction manager for County relating to electrical work for the construction of the Center.  Construct Two or its agents and others under its control or with contractual relationships possess substantial records relating to construction of the Center.

7.  Hunt, Clark, and Construct Two formed their joint venture, HCC, as a single purpose joint venture created to serve as construction manager for the construction of the Center.

8.  HCC maintains a principal place of business in Orlando, Florida, and at all times material to this action was and continues to be qualified to do business in the Florida.  HCC entered into a Construction Management Agreement with the County, which is not attached because of its bulk.  HCC's construction management agreement with the County was incorporated by reference into EME's Trade Contract.  HCC was formed to administer Hunt's, Clark's, and Construct Two's obligations to County, EME, and all other trade contractors for the construction of Center.  HCC or its agents and others under its control or with contractual relationships possess substantial records relating to construction of the Center.

9.  County is an incorporated political subdivision of the State of Florida, owner of the Center, and the party who entered into a Construction Management Agreement with HCC.  County benefited substantially from EME's work on Center.  On information and belief, the Construction Management Agreement contains provisions establishing a guaranteed maximum price ("GMP") that County has to pay for construction of Center, with any cost overruns being borne by HCC.

10.  As more fully appears below, HCC and County acted in concert and participation with one another in their relationship with EME under the construction management agreement.  Each was the agent of the other for the purposes alleged here, and the acts of each about which EME complains are legally the acts of all.

4

Background:  EME's Contact with Defendants

11.  Center consists of over 2,800,000 square feet of offices, exhibitor areas, and supporting facilities.  Center was supposed to be delivered before September 1, 2003, for a GMP to not exceed $490,000,000, of which $30,000,000 was designated as a contingency fund.

12.  EME commenced its work at Center pursuant to a Trade Contract with HCC dated July 25, 2001.  Because of its bulk, a copy of this contract is not attached here.

Background:  EME's Bid

13.  Pursuant to the Trade Contract, EME undertook to complete the scope of work for an original fixed price of $13,376,827.  At the time EME delivered its bid, EME reasonably believed that the drawings, specifications, schedule, addenda, and work presented to it and on which it bid accurately represented the work, sequence, and conditions that EME would confront in performing its work.  The EME work basically consisted of all branch circuit wiring, device wiring, installation of fixtures, and providing temporary power for all trades.  EME estimates that its work involved the installation of more than 10,000,000 feet of building wire, 4,000,000 feet of conduit, 30,000 light fixtures, and thousands of other electrical devices.  Based on the drawings, specifications, schedule, and scope of work represented prior to the bid, EME estimated that its work would be performed in approximately 311,000 man hours.

14.  At the time EME delivered its bid, EME learned that it was the low bidder, but that two other bidders had submitted bids extremely close to EME's bid.  In

addition, the selection of EME as the electrical trade contractor substantially assisted all

Defendants because EME is a Hispanic/minority contractor and County had established a

target percentage of 25 percent of all trade and subcontractors on the Center project to be

minority.  EME and its employees ultimately fulfilled almost 10 percent of the minority

requirement for the Center.

Background:  EME Faces Changed Conditions,<br>Scheduling, and Hindrances in Performing its Work

15.    After commencement of its work at Center, EME was faced, almost

immediately, with a substantial schedule change.  This schedule change required EME to

"hopscotch," instead of following the predicted and logical flow of work represented

prior to its bid and which formed the basis for EME's bid.  In some cases where the

original milestones and schedule would have required EME to work in certain areas only

two to three times and to have no interference from the presence of other trades, the new

schedule or the reality on the job required EME to revisit areas five and six times, not

follow the most logical work flow sequence, and be "stacked" with other trades.  The

schedule also shortened the time in which EME was required to perform its work.  EME

notified all Defendants of the impact the rescheduling would have on EME's

performance of the work and advised that there likely would be additional costs

associated with this impact.

16.    Thereafter, through no fault of EME, and without EME's consent, the

schedule for EME's performance of its electrical work was changed virtually every two

weeks.  This *ad hoc* rescheduling created substantial impact and costs to EME.

17.  In addition to rescheduling, EME was faced with a virtual lack of coordination of its work with the work of the other trades.  Efforts made at coordination were ineffective and rarely worked.  This was apparent because HCC could not meet even the continuously revised schedules.  HCC superintendents gave daily *ad hoc* direction for construction activity

18.  In addition to rescheduling and coordination problems, frequently EME arrived at the area designated for it to work per schedule or instruction of HCC only to find that the work area was not ready for EME to perform its work, or that other trades were in the same area, or that critical path work and successor activities that had to be completed before EME could work were not done, all of which interfered with EME's ability to perform its work efficiently.

19.  In addition to rescheduling, coordination problems, staging problems, and stacking problems, frequently EME arrived at a work area only to learn that the "as built" work performed by other trades or the actual equipment to be installed did not comply with the drawings and that EME would have to revise its planned installation or work method because of these unanticipated changes.

20.  In addition to the problems alleged above, EME was repeatedly forced to work out of sequence, with substantial hindrance to EME's performance of its work, and with factors causing significant inefficiencies, which could not be anticipated, all of which increased its estimated labor costs for completion of the work, through no fault of its own.

21.  In addition to all of the foregoing problems, in May of 2002, a tropical storm caused damage to the incomplete roof structure at Center, damaging EME's work and flooding all potential work areas.  Because the roof could not be completed until the structure totally dried out, from May of 2002 to September of 2002 EME was forced to work in wet conditions and sometimes flooded conditions, all of which contributed to substantial inefficiencies in performing its work.  In fact, the wet conditions required all trades to work on one level in the North building at Center for weeks, resulting in virtually no work efficiency.

22.  After the damage caused by the tropical storm, mold and mold abatement procedures caused further disruption to EME's ability to perform its work efficiently.  Once again, EME was directed by the Defendants to work "wherever they could," totally out of sequence and to "hopscotch" EME's 200 to 300 employees.

<u>Background:  EME's Impact Claim</u>

23.  As a result of the rescheduling, lack of logical work sequence, having to revisit work areas three to five times more than anticipated, facing work areas not ready for EME's work or "stacked" with other trades, unanticipated plan changes, flooding and wet conditions, mold and mold abatement, and the specific direction by HCC that EME continue to man the job, EME has expended and paid for in excess of 720,000 man hours to complete the original scope of work EME bid and agreed to perform under the trade contract.  Approximately 18,700 of these man hours were needed for changes for which EME received change orders and for which Defendants have agreed to pay, but for which EME has not been paid.  Substantially all of the remaining

8

hours, however, were not due to EME's fault, but rather were expended as the result of

the inefficiencies, interference, hindrance, and conditions caused by Defendants.  EME

expended these man hours in the anticipation that it would be paid for the impact of all

unanticipated and disruptive conditions and schedules it faced at Center.

24.  In fact, HCC acknowledged that EME had been substantially

impacted by inefficiencies and disruption that it did not create.  At program management

coordination meetings, including a meeting on October 31, 2002, HCC's representatives

acknowledged that EME had been significantly impacted by the inefficiencies, changes,

hindrances, and disruptive conditions.  The minutes of the October 31, 2002, meeting

contains the following:

> 10/31/02 CM states Encompass and EME have been
> impacted and may require compensation from CM.

"CM" in the minutes refers to HCC.  As a result, in May of 2003, Defendant HCC paid

EME a $1,500,000 advance against EME's impact claim.  Under applicable construction

law principles, all parties to EME's Trade Contract recognized and acknowledged in May

of 2003 that EME would have a multi-million dollar impact claim.

25.  By July of 2003, EME had substantially completed the scope of work

and change orders under the Trade Contract and advised Defendants that EME's impact

claim, due to disruption, rescheduling, and inefficiencies, would exceed $11,000,000 if

calculated in accordance with the compensation provisions of the contract.  At that time,

Defendants were suggesting a format for a resolution of EME's impact claim involving

millions of dollars in cash, with Defendants assuming any position or rights EME might

have to proceeds under the builder's risk insurance policy which was purported to cover the portion of EME's impact claim relating to storm damage.

26. The parties were unable to negotiate a resolution, though efforts continued through November of 2003. In fact, negotiations are continuing, and HCC and EME have filed a motion in EME's main bankruptcy case requesting this Court to set a pre-suit mediation as quickly as possible.

27. At the current time, EME has finished and fully performed its work at Center under the Trade Contract, except for possible warranty work over the next year. A substantial part of this work was performed post-petition.

28. EME proceeded in good faith on the belief that the Defendants would proceed in good faith toward a fair and final resolution of EME's impact claim.

<u>Irreparable Injury and Spoliation of Evidence</u>

29. EME had relied on the proceeds from additional work through December 31, 2003, and proceeds from its impact claim thereafter in estimating its future cash flow, both short term and long term, and in dealing with its creditors under EME's proposed Plan of Reorganization. The $11,000,000 impact claim represents a substantial asset of this estate and a key asset in the planned distribution to creditors and EME's anticipated future business operations as predicted under the proposed Plan of Reorganization and Disclosure Statement. EME's impact claim is only one of several anticipated trade contractor impact claims which may total more than $50,000,000.

30. As a result of the inability to resolve the impact claim, EME began to gather information relating to the Center and the reasons for which EME was impacted.

Toward this end, EME made more than 59 "Public Records" (Sunshine Law) requests of County.

31. Defendants have responded to some of the Sunshine Law requests, have provided only partial information as to others, and, in some cases, have simply refused to provide the requested information.

32. Dr. Richard Coble, an expert in building construction, has been designated by EME to collect the records of the Defendants required to be provided under the Sunshine Law requests. On Monday, December 15, 2003, Dr. Coble was advised that no records would be available for review during the next two weeks. In addition, Dr. Coble learned that, simultaneously with the pendency of requests, the Defendants, or their agents or employees, were destroying or trashing hard copy records relating to the Center and the events relating to construction of the Center, as well as deleting from computer networks critical notes of management personnel relating to the Center. Dr. Coble protested this spoliation of possible evidence and, as a result, County was requested to cease spoliation by attorney Leslie O'Neal-Coble of Holland & Knight who wrote a letter demanding that the destruction of records cease. Defendant responded that it would preserve certain specific records of the project manager, but did not agree to cease destruction or trashing of records. In fact, County Attorney Passiatore advised that, if EME were specifically aware of records being destroyed, it should advise the State Attorney.

33. Dr. Coble believes that records being destroyed by Defendants contain evidence relating to the causes of the impact on EME and other trade contractors

and which would be highly relevant in proving the causes and responsibility for the impact and financial liability therefor.

34.  Dr. Coble does not believe that the destruction of records will cease, and, in fact, believes that the timing of his inability to obtain records and the destruction of hard copy and computer records can only be designed to prevent potentially damaging evidence against Defendants from being produced.

35.  Dr. Coble's affidavit attesting to the facts set forth in Paragraphs 32, 33, and 34 above, filed on December 23, 2003, contemporaneously with the original complaint, is incorporated into this Amended Complaint by reference.

36.  As set forth in Dr. Coble's supplemental affidavit, filed on January 2, 2004, when Dr. Coble visited the site on December 28, 2003, he found that additional records, including original documents, and at least one computer had been put in the dumpster.  In addition, there were two other dumpsters that also contained Center construction and related records.  The allegations of Dr. Coble's supplemental affidavit are incorporated into this Amended Complaint by reference.

<u>Defendants' Motivation and Bad Faith</u>

37.  As a result of information and evidence already obtained pursuant to the Sunshine Law requests and careful review of EME's records and interviews with job site personnel, EME now believes that the Defendants never intended to reimburse EME fully for its impact claim and delayed resolution of EME's impact claim until EME had completed its work at the Center, despite weekly meetings and promises of resolution and payment made by Defendants' representatives to EME and its employees.  Furthermore,

12

EME now believes that the Defendants caused EME's impact claim for reasons, including, but not limited to the following:

a.  The standard form of contract dictated by the Defendants precluded EME from exercising it remedy of work stoppage even when faced with substantial changes in plans and conditions and resulting increased job costs.  Defendants did not want to acknowledge prior to the bid and execution of the contract that the "final plans" and milestone schedule given to EME for bidding and contract purposes were in fact obsolete.  Defendants did not make this disclosure because they knew that this disclosure would substantially increase all bids for the electrical work on the Center, and Defendants were determined to "hook" an electrical contractor with a contract that did not allow work stoppage in the event of substantial changes in plans and schedule, thereby intentionally disadvantaging the electrical trade contractor, and

b.  Defendants did not want to disclose, and failed to disclose to EME, that, rather than having done "value engineering" in the design phase of the Center, they were undertaking substantial "value engineering" to reduce the Center's cost by $30,000,000 to $50,000,000 during construction.  In the construction industry, "value engineering" is a euphemism for substituting lower priced equipment and product, or lower cost engineering solutions, for the original specifications established by the owner and architect.   Defendants knew or should have known that $30,000,000 to $50,000,000 in value engineering would substantially impact the project schedule and cause EME to have no consistent work flow and be required to face an ever-changing, hopscotched

schedule.  Defendants knew that a great deal of the value engineering directly impacted EME's electrical work, and

c.  Defendants were aware of architectural and engineering deficiencies in the original plans for the Center and that a portion of the Center, in reality, because of these deficiencies or requested owner changes, would not be built in accordance with the original plans and that instead the project would become a "fast track" and "design-build" project.  Defendants did not disclose this to EME prior to EME's bid and execution of the Trade Contract, and

d.  Defendants were aware that, as a result of the foreseeable schedule changes and hopscotching that would be caused by the value engineering, design deficiencies, engineering deficiencies, and changes to the work, and the fact that the job was quickly changing from one in which EME's plans and drawings were "complete" to EME facing a fast track/design build-type project, the Defendants should have reasonably anticipated that there would be substantial coordination problems, particularly because County wanted the Center opened on an accelerated time frame, and

e.  County insisted on the project being complete, "whatever it takes," by September of 2003 and expected the other Defendants to accomplish this within the GMP.  The other Defendants wanted to satisfy the County expectations for opening the Center (the first convention was actually booked for November of 2003) and did not want to expend amounts in excess of the GMP for which they may become responsible.

38.  In other words, the Defendants desired to save $30,000,000 to $50,000,000 by making substantial and material changes to the Center that would significantly affect EME's work and materially and substantially impact EME's schedule, as well as the work and schedule of the other trade contractors, and that would create substantial interference and hindrance with EME's ability to perform its work.  The Defendants knew that the true status of the project and the changes, the value engineering anticipated, engineering and design deficiencies, and other related matters would materially impact EME in the performance of its work and create substantial unanticipated disruption, hindrance, and inefficiencies for EME.  Defendants knew, or should have known, that the interference, disruption, hindrance, and inefficiencies caused by their actions would require EME to expend substantially more man hours and costs than if the project had proceeded in the fashion represented during the bid process.

The Result:  Defendants Benefit
While EME is Out of Pocket and Has a $11 Million Claim

39.  The Defendants, in fact, achieved their goals of opening the Orange County Convention Center on time and completing construction on an accelerated basis. It also appears from the records obtained in the Sunshine Law requests that they achieved the goal of reducing the cost of the Center by almost $50,000,000.

40.  EME respectfully submits that the Defendants achieved their goals on the backs of EME and the other trade contractors who were forced to deal with unanticipated and ever-changing conditions, requirements, and demands.  As a result of the Defendants achieving their goals, EME is owed approximately $11,000,000 for its

impact claim in accordance with the terms of the parties' Trade Contract.  To accomplish

this work, EME has expended, in cash and out-of-pocket, more than $3,500,000 for

additional impact labor for which it has not been compensated (not including additional

millions of dollars out of pocket for actual overhead that relates to the Center and without

considering anticipated profit).

41.  In addition, Defendants have refused to pay EME its retainage of

approximately $500,000 and $38,280 for services provided post-petition.

42.  All conditions precedent to the relief requested herein have been

performed or have occurred.

Count One<br>Claim for Injunctive Relief Against All Defendants

43.  EME adopts and incorporates by reference the allegations of

Paragraphs 1 through 42 above.

44.  Based on the actions of the Defendants as evidenced by the affidavits

of Dr. Coble, EME is in need of injunctive relief from this Court to preserve all books,

records, electronic, digital, or other information relating to this project until it can be

reviewed by EME.  EME is entitled to injunctive relief for the following reasons:

a.  EME has the likelihood of success on the merits of obtaining

these records either through continued Sunshine Law requests or in discovery.  Without

examination of records, there would be no way to determine the evidentiary value of

these records;

16

b.  Defendants are and have been aware of the existence of a potential civil action with EME since July 2003.

c.  County had a duty to preserve relevant evidence and public records pursuant to Section 119.031, Florida Statutes.

d.  HCC had a duty to preserve relevant evidence and public records pursuant to the owner/construction manager agreement and Section 119.031, Florida Statutes, and had a duty to preserve business records pursuant to Section 489.124(1), Florida Statutes, which requires all contractors to maintain complete financial and business records for the immediately preceding three years.

e.  EME has no adequate remedy at law to obtain these records. EME cannot force their turnover involuntarily or voluntarily prior to their destruction because the records sought are not EME's records and are under the control of others. EME has tried to obtain these records by a legal remedy of FOIA or Sunshine Law requests, and the Defendants have refused to comply fully with these lawful requests; and

f.  EME cannot be compensated in money damages for the destruction of these records because the records may contain unique evidence relevant to EME's impact claim that may not be obtained in the absence of their preservation and may not be able to be recreated by the expenditure of funds; and

g.  EME will be irreparably injured by the continued destruction of records because EME believes these records contain evidence probative of, and in fact proving, EME's impact claim, in particular the project manager's computerized notes to which EME has been refused access and that are now subject to destruction; and

17

h.  The public interest will be served, with no harm to the Defendants, if records are preserved.  The potential damage to EME is massive and the potential harm to the Defendants is negligible, as the Defendants currently have and possess the records.  As a matter of public policy, particularly on a public job, policy favors full and fair disclosure to a trade contractor owed $11,000,000.  No public policy supports destruction of records which may preclude obtaining relevant evidence damaging to the Defendants.

WHEREFORE, EME prays that the Court:

a.  Enter a temporary restraining order, without notice, prohibiting the Defendants, and their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise, from destroying, modifying, altering, deleting or otherwise disposing of any and all records relating to the Center and its construction, and

b.  After notice and a hearing, enter a preliminary injunction granting the same relief and ordering the Defendants, within 15 days, to comply fully and completely with all outstanding Sunshine Law requests, and

c.  If spoliation has occurred, strike the Defendants pleadings, enter defaults against Defendants, or impose other appropriate sanctions for such wrongful conduct, and

d.  Award EME its costs, and, if appropriate, its fees in bringing this action, and

e.  Grant such other and further relief as the Court deems
appropriate under the circumstances of this case.

Count Two
Claim for Turnover of Property of
EME's Bankruptcy Estate Against All Defendants

45.  EME adopts and incorporates by reference the allegations of
Paragraphs 1 through 42 above.

46.  EME is undisputedly owed $538,280 for EME's retainage held by
HCC and for approved past-due billings under the trade contract for non-impact claims,
such claim being more fully described in Count Four below.

47.  EME is owed $11 million (less a possible credit of $1.5 million
already paid by defendants to EME) on its impact claim, such claim being more fully
described in Counts Three and Five below.  There can be no good faith dispute about this
claim as defendants have admitted this claim in written Project Manager minutes and
have already made a substantial payment on account of the claim.

48.  The retainage, agreed past due billings, and amounts due on the
impact claim owed EME by the Defendants are property of the bankruptcy estate and are
critically necessary for EME's reorganization and for the benefit of its creditors and the
estate.

49.  EME made substantial performance after the filing of its bankruptcy
case.  Defendants achieved post-petition their principal benefit from EME's contract and
performance with the completion of the Center.  By virtue of this Court's order

authorizing EME to pay all prepetition vendors on the Center, Defendants received the additional post-petition benefit of uninterrupted performance by EME, its material suppliers, and its subcontractors, and avoided bond claims.  All that remains to be done in the relationship of the parties as to the Center is to have the Defendants pay EME on account of its claims.

50.  The amounts due EME on its claims are fully matured, due, and payable on demand.  There is no continuing performance by EME, or conditions precedent, necessary to EME receiving payment on its claims.  There is no running account between the parties that could reduce the amounts owed EME on its claims.

51.  Defendants have waived any offset rights against EME's claims for matters, including but not limited to, Owner Controlled Insurance Program ("OCIP") payments or other back charges that could be alleged because the defendants failed to file proofs of claim in EME's bankruptcy case, despite the time for doing so having past. Defendants are therefore not entitled to defend against EME's claims.

52.  HCC has received or will be receiving from County payment under its construction management agreement on account of EME's claims.  As a matter of Florida law, the funds being held or to be held by HCC on account of EME's claims are held in trust for the benefit of EME and are subject to segregation.

53.  It is critically important to the success of EME's reorganization that the defendants be compelled to turnover EME's property promptly.

20

WHEREFORE, EME prays that the Court enter its order compelling the Defendants to turn over promptly to EME its property that they are wrongfully withholding, and grant such further relief as may be appropriate.

Count Three
Claim for Breach of Implied
Duties and Warranties Against All Defendants

54.  EME adopts and incorporates by reference the allegations of Paragraphs 1 through 42 above.

55.  Under Florida common law, Defendants had an implied duty to cooperate with and not to interfere with EME's performance of its work on the Center; Defendants had an implied duty to coordinate the project to allow EME to perform its work in a reasonable manner; Defendants had an implied duty to provide EME with reasonable access to the site to perform its work; and Defendants impliedly warranted that the plans and specifications provided to EME were adequate for performance of EME's work on the Center.

56.  Defendants breached these implied duties and warranties to EME as set forth in paragraphs 15 through 28 above.

57.  Defendants' breaches of their implied duties and warranties have caused EME to suffer damages in the sum of approximately $11 million.

58.  As a result of Defendants' breaches of their implied duties and warranties, EME has been required to retain the undersigned attorneys to represent it in this action and has agreed to pay its attorneys a reasonable fee for which HCC is liable pursuant to Article 34.4 of the Trade Contract.

21

WHEREFORE, EME prays that the Court will enter judgment in its favor for damages, prejudgment interest, costs, attorney's fees and for such further relief as the Court may deem appropriate.

Count Four
Claim for Breach of Contract Against HCC

59.  EME adopts and incorporates by reference the allegations of Paragraphs 1 through 42 above.

60.  On or about December 23, 2003, EME submitted its pay request to HCC for work performed at the Center during the period from October through November 2003 in the amount of $38,280.00.

61.  On or about December 30, 2003, EME submitted a request to HCC for reduction of its contract retainage in the amount of $500,000.00.

62.  In response to EME's requests, HCC presented EME with proposed Change Order #31.

63.  Defendant HCC has demanded that EME agree to and execute Change Order #31, which is a deductive change order for $821,935 for additional insurance premiums under the County's Owner Controlled Insurance Program ("OCIP") for the Center.  This additional premium was calculated on additional man hours which EME expended in completing the Center, but for which EME has not been compensated. HCC has refused to pay EME's pay request or to reduce EME's retainage unless EME agrees to and executes Change Order #31.

22

64. HCC has not filed a proof of claim in this court regarding its claim for additional OCIP premiums.

65. HCC's demand that EME execute Change Order #31 to receive payment and its failure to pay EME's pay request are breaches of the Trade Contract.

66. As a result of HCC's breach of contract, EME has been damaged in the amount of $538,280.00.

67. As a result of HCC's breach of contract, EME has been required to retain the undersigned attorneys to represent it and has agreed to pay its attorneys a reasonable fee, for which HCC is liable pursuant to Article 34.4 of the Trade Contract.

WHEREFORE, EME prays that the Court will enter judgment in its favor against HCC in the amount of $538,280.00, plus interest, costs and attorney's fees, and for such further relief as the Court may deem appropriate.

Count Five
Claim for Breach of Contract Against HCC

68. EME adopts and incorporates by reference the allegations of Paragraphs 1 through 42 above.

69. EME's Trade Contract was modified by HCC directives that were not included in approved change orders ("Constructive Change Directives").  EME complied with the Constructive Change Directives and incurred additional costs as a result.

70. EME notified HCC that the Constructive Change Directives constituted changes to the Trade Contract and submitted requests for change orders increasing the Trade Contract sum and extending the Trade Contract performance period.

23

71. Although EME satisfactorily performed the extra work as directed, HCC failed or refused to agree to the change orders that EME requested for the Constructive Change Directives ("Unpaid Change Orders").

72. EME's work under the Trade Contract also was disrupted and impacted by events that were unforeseeable, beyond EME's ability to control and caused EME to incur additional costs for which it is entitled to be compensated by HCC under the Trade Contract. The events that delayed, disrupted, and impacted EME's work include, but are not limited to, massive changes to the original design through "value engineering," defective plans and specifications, lack of site access, owner directed design modifications, disruption from other trade contractors, HCC's failure to properly schedule and coordinate the work, HCC's failure to inspect the work in a logical or timely fashion, HCC's failure to adhere to its own schedule, HCC's failure to properly supervise and administer work on the Center, and HCC's  Constructive Change Directives (collectively referred to "Project Disruptions").

73. The Project Disruptions forced EME to deviate from its plan for performing its scope of work on the Project, impeded the flow of EME's work, and delayed critical construction activities.

74. EME incurred additional costs as a result of the Project Disruptions for which it is entitled to be paid by HCC under the trade contract.

75. EME properly notified HCC that its work was being impacted by the Project Disruptions and requested additional compensation and appropriate extensions of

time to complete its work and submitted a formal claim for payment on July 16, 2003, pursuant to Article 21 of the Trade Contract.

76.  HCC failed or refused to increase the contract sum or to grant the time extensions EME requested.  In addition, HCC directed EME to complete all work within a shorter time frame than the original performance period.

77.  HCC's failure to extend EME's performance period and directive to complete the work within a shorter time period than that contemplated by the original schedule constitutes a constructive acceleration to the trade contract.

78.  EME accelerated its work and incurred additional costs as a result.

79.  EME provided HCC with proper notice that it was incurring additional costs in connection with the constructive acceleration and requested additional compensation from HCC to pay for the acceleration effort.

80.  To date, HCC has not compensated EME for the additional costs that EME incurred due to the disruption, impact and acceleration EME experienced during construction of the Center.

81.  EME has been damaged by HCC's failure to compensate it for the additional costs due to the disruption, impact and acceleration EME experienced during construction of the Center in an amount in excess of $11 million.

82.  As a result of HCC's failure to pay EME for its additional costs, EME has been required to retain the undersigned attorneys to represent it in this action and has agreed to pay its attorneys a reasonable fee for which HCC is liable pursuant to Article 34.4 of the Trade Contract.

25

WHEREFORE, Plaintiff prays that the Court will enter judgment in its favor for damages, plus prejudgment interest, costs and attorney's fees, and for such further relief as the Court may deem appropriate.

Respectfully submitted,

C. TIMOTHY CORCORAN, III, P.A.
400 N. Ashley Drive, Suite 2540
Tampa, Florida  33602
(813) 769-5020
(813) 769-5030 (fax)
Special Counsel for EME

January 4, 2004                    By /s/  *C. Timothy Corcoran, III*
                                      C. Timothy Corcoran, III
                                      Florida Bar No. 0161248